UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

MICHAEL L. WASLIN, On Behalf of Himself ) No. 3:09-cv-00106-JBA
and All Others Similarly Situated,                 )
                                                                  )
                                       Plaintiff,            )
                                                                  )
                    vs.                                      )
                                                                  )
VERTRUE INC., previously known as        )
MEMBERWORKS, INCORPORATED, and  )
ADAPTIVE MARKETING LLC,                  )
                                                                  )
                                   Defendants.           )
                                                                  ) FEBRUARY 5, 2009
_____

FIRST AMENDED COMPLAINT FOR:
(1) VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT, 15 U.S.C. §1693 *ET
SEQ.*; (2) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §§1962(c) AND 1964(c)-CREDIT CARD FRAUD
ENTERPRISE (PARTICIPATION IN AN ENTERPRISE); (3) VIOLATIONS OF THE
RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C.
§§1962(d) AND 1964(c)-CREDIT CARD FRAUD ENTERPRISE (CONSPIRACY TO
VIOLATE 18 U.S.C. §1962(c)); (4) VIOLATIONS OF THE RACKETEER INFLUENCED
AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. §§1962(c) AND 1964(c)-
PARTICIPATION IN REGULATORY ENTERPRISE (OBSTRUCTION OF JUSTICE);
(5) VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATIONS ACT, 18 U.S.C. §§1962(d) AND 1964(c)-REGULATORY ENTERPRISE
(CONSPIRACY TO VIOLATE 18 U.S.C. §1962(c)); (6) CONNECTICUT GENERAL
STATUTES §42-110a; (7) CONVERSION; (8) UNJUST ENRICHMENT; (9) FRAUD;
(10) NEGLIGENT MISREPRESENTATION; (11) MONEY HAD & RECEIVED;
(12) RECKLESS & WANTON CONDUCT; AND (13) CIVIL THEFT

DEMAND FOR TRIAL BY JURY

NOW COMES plaintiff Michael L. Waslin ("Waslin"), on behalf of himself and all others

similarly situated, by and through counsel, and for his Complaint states the following:

## SUMMARY OF COMPLAINT

1.    Defendant MemberWorks, Incorporated,[1] also known as MWI Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, MWI Value Max and other MWI entities, which subsequently changed its name to Vertrue Inc. (collectively, "MWI"),[2] in conjunction with its co-conspirators, the telemarketing entities (collectively, the "Telemarketers" or "Telemarketing Entities")[3] and the bait product suppliers ("Bait Product Suppliers") have been engaged in the practice of making unlawful charges to consumers' credit and/or debit cards through a scheme involving the mailing of an unordered membership program marketed through the use of a

---

[1]    MemberWorks, Inc. with Adaptive Marketing LLC is referred to herein as "Defendants."

[2]    As used in this Complaint, the term "Defendants" does not refer to West Corporation, and/or West Telemarketing Corporation, and/or West Telemarketing, L.P. and their predecessors, successors, present and former owners, subsidiaries, affiliates, employees, officers, directors, agents, attorneys and assigns, including West Direct, Inc. and West TeleServices Corporation (collectively, "West"). Therefore, any reference to acts or omissions by "Defendants" does not include or refer to the West entities. Further, the claims for relief in this Complaint do not arise from actions or omissions under the following agreements: the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements. Thus, by way of example (but without limitation), any acts or omissions that include, relate to or were part of an upsell to a Tae-Bo product that occurred under or as part of one of the agreements listed in this footnote 1, are not included in the claims and allegations of this Complaint.

[3]    As used in this Complaint, the terms "Telemarketers" and "Telemarketing Entities" and the allegations of this Complaint referring to acts or omissions of "Telemarketing Entities" and "Telemarketers" do not include or refer to the actions or omissions of West Corporation and/or West Telemarketing Corporation under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 Wholesale and Retail Marketing Agreement between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.

deceptive script.  Defendants obtain the necessary information to mail their unwanted membership

(and charge for it) through the use of a telemarketing scam.  By this method, Defendants are able to

accomplish the old and pernicious practice of mailing unsolicited merchandise and then tricking

consumers into paying for it.

      2.      MWI, in concert with the Telemarketers and the Bait Product Suppliers, through

agreements with MWI, capture consumers' credit and/or debit card information when those

consumers call to order products – products which are ***not*** marketed or produced by MWI.  This is

referred to as an "inbound" telemarketing call, as the consumer initiates the call.  The consumer has

initiated the call to inquire about or purchase a product usually advertised with a 1-800 number.  The

consumer ***does not call*** to order an MWI product.  In fact, the consumer has most likely never heard

of MWI and has no expectation of receiving an MWI membership program when the call is made by

the consumer.  Moreover, the consumer gives his/her credit card or debit card information, which

Defendants capture long before the consumer ever hears of any MWI product.  This private financial

information is then used by Defendants to charge the consumer for a membership the consumer

never wanted or agreed to purchase.

      3.      MWI has reached agreements with a number of Telemarketing Entities, whereby the

consumer is subjected to a deceptive sales pitch to purchase an MWI membership program before

the call made by the consumer to purchase an unrelated product is completed.  This is referred to as

an "unrelated upsell."  MWI's products are not related to the product sought by the consumer and the

consumer has no idea that an MWI product will be made a part of the call – or even what an MWI

product is.

      4.      MWI prepares a script for the Telemarketers to use for the unrelated upsell.  As more

specifically alleged below, MWI pays the Telemarketers and the Bait Product Suppliers a fee for

each consumer who they enroll in MWI's membership programs.  Some number of MWI

membership programs are sold through a joint venture and wholesale arrangement between MWI and the Telemarketers, where MWI and the Telemarketers jointly pay a separate fee to the Bait Product Suppliers for each of their customers enrolled in an MWI program. The Telemarketers, who handle the inbound calls, approve the scripts, read the scripts to the consumers, capture the consumers' credit and/or debit card information and transmit that information to MWI to mail the "kits" and bill the consumers' cards.

5.      After the consumers have given the information necessary to purchase the product the consumers called to buy, a deceptive script is read to the consumers informing them that they will be sent *free* materials in the mail. Consent to receive the materials in the mail is not requested. Consent to bill the credit and debit cards is not requested. In actuality, Defendants enroll consumers in a membership and mail them a membership "kit." Consumers are deceived and do not know that they have been enrolled in a "membership" and will be charged $60-$150 annually unless they call MWI to inform them that they want to cancel the FREE 30-day trial membership. MWI mails a packet with a membership card to the consumers which allows the consumers to access the so-called benefits of an MWI membership. By enrolling consumers who called to order an unrelated product and mailing those consumers a membership kit without the prior express consent of the consumers, consumers are unwittingly charged by Defendants for a membership they neither requested nor intended to purchase.

6.      Consumers are never asked their permission for the Telemarketers to provide their credit and/or debit card information to MWI. MWI has the Telemarketing Entities transfer the class members' confidential credit and/or debit card information to MWI, who uses the information to charge consumers membership fees and membership renewal fees which range from $60-$150 annually. Although MWI processes the charges, neither it nor the Telemarketing Entities send the

consumers any bill or invoice notifying them that their credit and/or debit cards have been assessed such a charge.

7.       In order to conceal their scheme, MWI will reverse the charges for those consumers who notice that they have been assessed a charge on their credit and/or debit card statements who call to question the charge and get through Defendants' multifarious system of avoiding cancellations.  However, as Defendants know, a significant percentage of the population does not closely review their credit and/or debit card statements, and will not notice the offending charge (as was the case with plaintiff Patricia Sanford in the federal action *Sanford, et al. v. MemberWorks, Inc., et al.*, No. 02-CV-0601 (S.D. Cal.) ("*Sanford* Federal Class Action")[4], who did not realize she had been assessed such a charge until the ***second*** time it appeared on her credit card statement). These individuals are charged between $60-$150, each year, until they notice the charge and complain.  ***Defendants never send any bill or invoice to the class members notifying them that they have been, or will be, charged***.  The named plaintiff and the class members (defined below) in this action were all victimized by Defendants by this same exact method.

8.       Defendants share in the revenues and profits generated from their deceptive scheme of mailing unordered merchandise and then charging consumers for it.

---

[4]       The *Sanford* Federal Class Action was filed in 2002, as a class action against West and MWI in the United States District Court for the Southern District of California.  The claims against MWI were asserted on behalf of all consumers in the United States enrolled in an MWI membership in connection with their purchase of an unrelated bait product.  The claims against West were asserted on behalf of all consumers in the United States enrolled in an MWI membership program who were customers of a joint venture between MWI and West or were wholesale customers of West.  The district court dismissed the federal count against West and declined to exercise supplemental jurisdiction over the state law claims.  Plaintiffs re-filed the state law claims against West (*Patricia Sanford v. West Corporation and West Telemarketing Corporation, et al.*, Case No. GIC 805541 (the "*West* Action")).  The *West* Action included the same or similar claims, based on the same factual allegations asserted in this action.  The *West* court certified a class (February 16, 2007 Order Granting Plaintiffs' Motion for Class Certification), the case settled and Final Approval of the settlement was entered on December 24, 2008.

## JURISDICTION AND VENUE

9.      This action arises under 39 U.S.C. §3009, 15 U.S.C. §1693 *et seq.* and 18 U.S.C. §1962 *et seq.*

10.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1331 (federal question), 28 U.S.C. §1337 (federal regulation of commerce) and 28 U.S.C. §1367 (supplemental jurisdiction).

11.      This Court has jurisdiction over all claims under 28 U.S.C. §1332(d). Jurisdiction is proper because: (1) the aggregated claims of the individual members of the proposed class exceed the sum or value of $5,000,000; and (2) this is a class action in which plaintiff and Defendants are citizens of different states. 28 U.S.C. §1332(d)(2).

12.      This Court has jurisdiction over each defendant named below because each defendant is either a corporation or association organized under the laws of the State of Connecticut, a foreign corporation or association authorized to do business in Connecticut and registered with the Connecticut Secretary of State, or does sufficient business, has sufficient minimum contacts with Connecticut or otherwise intentionally avails itself of the Connecticut market, through the manufacturing, production, promotion, sale, marketing and distribution of its products in Connecticut, to render the exercise of jurisdiction by the Connecticut courts permissible under traditional notions of fair play and substantial justice.

13.      Venue is proper in this Court because, at all relevant times, Defendants either maintained offices in Connecticut, a substantial portion of the practices complained of herein occurred in Connecticut under 28 US.C. §1391 *et seq*., or because defendants have received substantial compensation as a result thereof in Connecticut.

14.      It should also be noted that the Class Action Fairness Act was enacted February 18, 2005.

## PARTIES

15.    Plaintiff Michael L. Waslin has been, at all times relevant to the action, a resident of Cleveland, Ohio.  Waslin has purchased various products after watching television commercials advertising these products and displaying a 1-800 number to call.  While plaintiff knows that one of the three bait products under which he was enrolled was an Ab Slider, he cannot recall which of the three purchases was the Ab Slider.  However, MWI's internal databases will identify the bait products that were purchased.  In connection with these purchases, MWI charged Waslin unsolicited, unauthorized and unexpected charges for several of MWI's membership programs.  Waslin was never asked his consent to be charged for any of these MWI membership programs.  Moreover, Waslin never utilized or received any benefit from any of the MWI membership programs.

(a)    On or about August 12, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly Ab Slider), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Waslin, informing him he was receiving a risk-free 30-day trial membership in Essentials, emphasizing the thank you gift was FREE and that he "WON'T BE BILLED."  The language of the deceptive telemarketing pitch is quoted in full in ¶23 below.  The telemarketer thereafter transferred Waslin's confidential credit card information to MWI using the wires.  Thereafter, on September 18, 2002, MWI charged Waslin's debit card $96.00 (charged as "MWI Ess").

(b)    On or about September 10, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly Ab Slider), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Waslin, informing him that he was receiving a risk-free 30-day trial membership in Essentials, emphasizing the thank you gift was FREE and that he "WON'T BE

BILLED." The language of the deceptive telemarketing pitch is quoted in full in ¶23 below. The telemarketer thereafter transferred Waslin's confidential debit card information to MWI using the wires. Thereafter, on October 15, 2002, MWI charged Waslin's debit card an unsolicited and unexpected $96.00 (charged as "MWI 24 Prot").

(c)     On or about July 15, 2002, at the end of the call to purchase a bait product – plaintiff cannot remember which one (possibly Ab Slider), however this information is contained in MWI's database – the telemarketer who answered the call read MWI's deceptive telemarketing pitch to Waslin. On August 22, 2002, MWI charged Waslin's debit card $1.00 (charged as "MWI Homework"). On September 25, 2002, several weeks after the purchase of the bait product, MWI charged Waslin's debit card an unsolicited and unexpected $149.95 (charged as "MWI Homework").

16.     In addition, plaintiff includes in his allegation the names, the dates of the fraudulent charges and the bogus membership enrollment for 236,107[5] of the unnamed class members. The names of the unnamed class members represent only a fraction of the unnamed class members included in the proposed class. The identity of the remainder of the unnamed class members are contained within MWI's electronic database(s), and will be revealed through discovery. Each of these unnamed class members, as well as each of the unnamed class members who have yet to be identified through discovery, received the deceptive telemarketing pitch at the end of their calls, the language of which is quoted at ¶23 below.

17.     Defendant Vertrue Inc., previously known as MWI, has been, at all times relevant to the action, a Delaware corporation whose primary place of business is 20 Glover Avenue, Norwalk, Connecticut. Defendant MWI does business in Connecticut, and throughout the nation, as MWI

---

[5]     The information regarding these unnamed class members was obtained pursuant to a protective order and is required to be filed under seal. If the Court desires, plaintiff will amend this Complaint to add these additional unnamed class members.

Essentials, MWI Leisure Advantage, MWI Home & Garden, MWI Connections, Health Trends, Travel Arrangements, Transmedia, Cardmember Protection Service, Countrywide Dental, 24 Protect, Smartsource, Value Max Shopping Service, Money Master Tai Value Max, Tai Vital Basics and various other names under which it markets and charges consumers, by and through nationwide telemarketing campaigns, as well as by and through the interstate instrumentality of mailings throughout Connecticut and the nation. Defendant MWI entered into express and tacit agreements with the Telemarketers. Defendant MWI drafted the deceptive script used and sought comments from and approval by the Telemarketers. Defendant MWI operates and is involved in the unlawful scheme of charging the credit card and/or debit card accounts of consumers for unordered merchandise.

18.     Defendant Adaptive Marketing LLC is a Delaware limited liability company with its principal place of business, with Vertrue Inc.'s, in Norwalk, Connecticut. Adaptive Marketing LLC is a wholly-owned subsidiary and "operating company" of Vertrue Inc. Adaptive Marketing LLC shares personnel with Vertrue Inc. and markets Vertrue Inc.'s membership programs. There exists, and at all relevant times existed, a unity of interest and ownership between MWI and Adaptive Marketing LLC, such that any individuality and separateness between each of them ceased and each is the alter ego of the other in that each entity is completely controlled, dominated, managed and operated without regard for corporate individuality.

19.     In committing the wrongful acts alleged herein, Defendants have pursued a common course of conduct, acted in concert with, aided and abetted and conspired, in furtherance of their common plan, scheme or design to make unauthorized charges to customers' credit and/or debit cards for an unsolicited, unwanted and unordered membership and thereafter to conceal and cover up their wrongdoing – all for their own personal profit. Defendants actually knew, or should have known, of the fraudulent conduct being committed and actively participated in covering up its true

nature. Thus, in addition to the wrongful conduct herein alleged as giving rise to primary liability, Defendants further aided and abetted and knowingly assisted each other in the breach of their respective duties, contracts and obligations as herein alleged, and acted as the agent of each other in participating in this wrongdoing.

20.    At all times herein mentioned in the claims for relief alleged herein, each and every defendant was an agent and/or employee of each and every other defendant. In doing the acts alleged in the claims for relief alleged herein, each and every defendant was acting within the course and scope of this agency or employment, and were acting with the consent, permission and authorization of each of the remaining defendants. All of the actions of each defendant as alleged in the claims for relief stated herein were ratified and approved by every other defendant or their officers or managing agents.

## DEFENDANTS' WRONGFUL CONDUCT

**The Upsell**

21.    Defendants obtain the necessary information to bill consumers for MWI memberships by piggybacking onto popular consumer products. MWI looks for products advertised heavily on television or in print which ask consumers to call a 1-800 number to order that product. Some examples of the products which MWI uses to upsell its programs are: Nad's, vitamins, knives, Q-Ray bracelets, Edgemaster paint roller, Simoniz car washer, flowers, dance videos, AB Slider, ultrasonic toothbrushes and OxiClean.

22.    The consumers see the advertising for the product (such as a Nad's, a Simoniz car washer or an OxiClean infomercial) and call the 1-800 number. The consumer has not seen or heard anything about any MWI product and has no desire or intent to purchase an MWI product. The consumer is most likely to wind up speaking with an employee of the Telemarketers. The consumer goes through the process of ordering the product the consumer wanted and the Telemarketing

Entities who handle the incoming calls "capture" the consumer's credit or debit card information. This portion of the call may take anywhere from approximately 5 to 15 minutes.

23.    Before the telemarketer lets the consumer off the line, MWI has the telemarketing entity read the following deceptive script to the consumer:

> Mr(s) _____, for purchasing **[NAME OF BAIT PRODUCT]** today, we're sending you a risk-FREE 30-day membership to **[MWI PROGRAM]**, a service designed to SAVE YOU 20% from leading stores such as **[STORES]**, PLUS additional savings on eyewear, beauty products, haircuts and more!  After 30 days, the service is extended to a full year for just $6 a month, billed annually in advance to the credit card you're using today.  If you want to cancel, just call the toll-free number that appears in your kit in the first 30 days and YOU WON'T BE BILLED. So look for that kit in the mail, OKAY?[6]

24.    The words in ALL CAPITAL LETTERS are the words the telemarketer emphasizes when reading the script. In other words, MWI emphasizes that the trial membership is "FREE," and that class members "WON'T BE BILLED."  At the end of the call, MWI merely tells class members: "So look for that kit in the mail, OKAY?"  MWI does not ask the consumers if they want to receive the purported trial membership, let alone any agreement to be enrolled in the membership. And, MWI does not ask the consumer for permission or consent to charge their credit cards and debit cards.

25.    At most, the consumer is led to believe that a free trial membership will be mailed to the consumer to evaluate, and if the consumer likes the product he or she can call to purchase a membership.  ***No express consent to mail the membership is obtained from the consumer, let alone any agreement to be enrolled in the membership.  Nor is any express consent requested to bill the consumers' credit or debit cards***.  This is Defendants' "upsell" and Defendants' excuse for charging consumers for a membership program they neither wanted nor ordered.

_____

[6]    While there can be minor variations to the script – *e.g.*, the list of stores can change, the MWI program can change, the script may say "to thank you for your purchase," or as a "special thanks," and such – the substance of the telemarketing pitch is identical across all scripts.

26.     Notwithstanding the failure to obtain consent to enroll consumers in MWI's membership programs and charge their cards, the Telemarketing Entities transfer the class members' confidential credit and/or debit card information, which they obtained when the consumers called to purchase the unrelated bait products, to MWI.  MWI then mails a membership kit and charges the consumers' credit and/or debit cards.  Neither Defendants, the Telemarketing Entities, nor the Bait Product Suppliers seek or obtain the consumers' express consent to charge the MWI membership to the consumers' credit and/or debit card accounts.

27.     The fraud at issue is the assessment of an unsolicited and unlawful fee charged to consumers which the consumers did not seek out and did not want.  The consumers are deceived by Defendants' purposely misleading script, then mailed a membership kit and enrolled and charged for a membership they did not want or order.  Defendants' automatic self-renewing membership is an outright theft of money under the guise of a membership.

**The Mechanics of the Scheme**

28.     To generate calls, Defendants rely on the popularity of the non-MWI products offered by the bait entities.

29.     After a consumer has viewed an infomercial or read an advertisement for a bait product they want to purchase, the class members call a "1-800" telephone number to order the product.  The purchasers of these products are given the option of purchasing by credit card or debit card.  To complete the purchase, the class members are required to provide their names, credit card or debit card numbers and the expiration date to the Telemarketers who answer the calls and process the sales.  Thus, at the end of the purchase transactions, the Telemarketing Entities possess all of the information necessary for MWI to assess the unsolicited membership fees against unsuspecting consumers.

30. After the financial information for the sale of the advertised bait product is obtained by the Telemarketers, MWI has them read the "upsell" script. The message of the upsell script is that the consumer will be mailed a 30-day, risk-free trial membership. The class members are not asked whether they want to enroll, they are not billed or invoiced and they are not asked to give or to confirm their credit or debit card information to pay for the membership. Instead, Defendants wait approximately 30 days and then charge the class members' credit and/or debit cards using the information Defendants received from consumers when they purchased the product they actually wanted.

31. The class members are never asked to provide their confidential credit or debit card information in connection with the unrelated MWI upsell. Class members are never asked to give permission to permit their confidential financial information to be transferred to defendant MWI. The class members are never even asked if they want to receive the purported membership materials – rather they are simply informed that for purchasing the advertised product, risk-free they are being sent a 30-day trial membership. The purported membership kit which allows the consumer to access the so-called benefits of the program are mailed shortly after the call.

32. Approximately one month after the call, defendant MWI uses the confidential financial information it received from the consumers' purchases of the unrelated product to charge the class members' credit and/or debit cards. As happened with plaintiff Waslin, some consumers are "enrolled" more than once. This situation could only arise if the consumers did not know they had already been enrolled, or were going to be enrolled, in the purported membership as no one would twice pay $60-$150 to MWI to join the same membership. It, of course, makes no difference to MWI how many times a consumer is enrolled, as each "enrollment" is simply another $60-$150 a year for MWI, other than if a member is "enrolled" multiple times, they are more likely to notice the offending charge.

33.     The class members do not know they have been enrolled in MWI's membership programs and therefore never use any of the programs' so-called benefits (*see* ¶¶50-57 below). Defendants count on this deception and subsequent non-use of the benefits to hold the costs of the programs to a nominal amount thus making the annual fees pure profit for Defendants.

34.     Unless the class member notices the charge to their debit and/or credit card and calls to complain, the class member will continue to be charged $60-$150 each year.  As with the initial charges to the class members' credit and/or debit cards, no invoice or bill is ever sent to the class members to inform them that their credit and/or debit cards have been, or will be, charged by defendant MWI.  What is even more insidious is that the purported "annual" membership is charged every 11 months and, similarly, no invoice or bill is ever sent to the class members for renewal charges.

35.     The fraud is perpetuated because the customers' prior expressed acceptance or consent to enroll in the membership is not obtained.  Defendants do not clearly and unambiguously communicate the terms of the purported membership programs.  The membership that is mailed is neither risk-free, nor a free 30-day trial as was represented by Defendants.  Defendants charge the class members for a membership they did not order.  The consumers charged for the membership who never use the so-called benefits are paying $60-$150 per year for nothing.

36.     Defendants know that consumers do not understand that they will be charged a membership fee unless they call to cancel based on Defendants' testing, data and past experiences. Defendants mail the membership kit fully understanding that the consumer will not understand they are being charged for the materials.  Further, Defendants have designed the generic membership materials so as to appear to be "junk mail" so the materials will be discarded and thus never read. Defendants purposely design their scripts to maximize consumer confusion and allow Defendants to "enroll" the maximum number of unsuspecting persons.  Defendants then mail the membership kit to

the deceived and/or confused consumers who Defendants "enroll" in the MWI memberships. Defendants are able to maximize their profits at the expense of the consumers deceived by Defendants' scheme.

37.     The *only* notice that a class member receives that he or she has been charged for a membership is his or her credit or debit card statement reflecting a charge – which may or may not identify MWI as the entity who levied the charge – which the class member may not notice depending on how closely the class member reads his or her credit and/or debit card statement.  If the class member notices and challenges the charge, the charge may be reversed or a pro rata refund may be sent.  In this way, Defendants conceal their deception from the other class members and from the public.  Those class members who do not notice the charge are billed every 11 months until they notice that they have been charged and complain.

38.     These acts take place as a result of the concerted action, agreement and direction by Defendants.

**The Lack of Audiotaped Confirmations**

39.     Until required as part of the Nebraska Attorney General "Better Practices" requirements, Defendants failed to confirm consumers' acceptance of the upsell offer by MWI for many, if not most, of the "enrolled" consumers.

40.     Accordingly, no audiotaping of the upsells occurred for most of the class members deceived by Defendants.

**The Deceptive "Upsell" Script**

41.     Defendants worked together to produce a script to be read to each consumer.  MWI creates the deceptive scripts to be read when marketing the MWI programs and the Telemarketing Entities comment on and approve the deceptive scripts.

42.     Defendants purposely avoid clearly and unambiguously notifying consumers that their credit and/or debit cards will be charged between $60-$150 for the "membership" mailed to

them.  No focus groups or other consumer research is undertaken by Defendants.  Even after Defendants received numerous consumer complaints, ranging from a lack of any recollection of ever even hearing of MWI or any of its purported memberships to accusations of fraud and theft, Defendants avoided ascertaining whether their scripts clearly and unambiguously: (1) requested consent from the consumer to charge for the membership; (2) notified the consumers of the terms of the purported membership; or (3) informed the consumers that their credit and/or debit cards would be charged.

43.    Defendants are well aware of the fact that consumers are deceived by their scripts as seven state attorneys general alleged that MWI was deceiving consumers.  MWI settled the matters with five of the attorneys general, and agreed to pay civil penalties in excess of $2 million to one of those attorneys general.  Defendants know that consumers are misled into believing that they are not making a purchase decision regarding the MWI memberships.  Defendants' script is intended to, and does, convey to consumers that the membership mailed to them is a free trial membership, which if they like the membership they can call to order.

44.    The scripts are written and designed to be read in a manner intended to confuse, mislead and deceive consumers.

45.    Defendants' conduct is deceptive, unlawful and fraudulent and it cannot be justified in any manner.  Indeed, seven different attorneys general have determined that these same MWI scripts are deceptive and do not clearly and unambiguously communicate to consumers that they will be charged for an annual self-renewing membership unless they affirmatively act to cancel the membership.  Nor do the scripts inform the class members that they will be required to return the purported membership card should they desire to cancel.

**The Membership**

46.     After receiving the class members' confidential financial information by piggybacking onto the advertised product, defendant MWI mails out membership materials and customer service information to the persons enrolled.  Then, MWI simply charges the consumers $60-$150 each year on the consumer's credit or debit card.

47.     Defendants have designed the generic purported membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the so-called benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  The kits contain a cheap paper membership card typical of cards received in mail solicitations.  This card is, however, the actual membership card for the enrolled member.  By making the kit typical junk mail, Defendants further conceal the fact that the class members have been charged an annual, self-renewing membership fee.

48.     Other than the one line on their credit and/or debit card statements, the class members are not notified that they have been "enrolled" in an MWI membership program or that their credit and/or debit cards have been charged.  Defendants do not send new "members" any invoice or record of the charge.  Moreover, after the membership kits are mailed and consumers are charged and throughout the duration of the "membership," class members never hear from any of the Defendants about any membership benefits.  After the initial mailing of the membership kit, consumers do not receive any newsletters, coupons, surveys or any other notifications.  The only thing they receive is a charge of $60-$150 on their credit and/or debit cards.

49.     The term "membership" used by Defendants is merely an excuse to take money from consumers who submit their credit and/or debit card information for their purchase of other products.

Defendants take consumers' money by mailing them an unordered membership and then charging them for it.

**Lack of Usage of the Membership Benefits**

50.    The manner in which a consumer can access the purported membership is further evidence of Defendants' scheme to defraud.  Other than the purported membership kit, Defendants do not send "members" anything.  No newsletter or other correspondence is sent to the class members.  No confirmation letters or satisfaction surveys are sent.  The class members receive nothing after they are charged, or before the next time they are "renewed."

51.    For consumers to obtain the purported membership benefits, they must contact defendant MWI either by telephone or via the Internet, and obtain certificates through MWI.  If the retail establishment works with MWI, then the consumer can order a certificate that can be used at that retail establishment.  Unless the consumer knows to call MWI, they receive nothing.[7]

52.    In the *West* Action, MWI produced a database containing the transactions of 567,430 California consumers, many of whom are members of the class.  Some of these consumers were enrolled under West's Joint Venture and Wholesale arrangements with MWI, which were settled in the *West* Action and for which no recovery is sought in this action.  The database establishes that 552,605 (or 97.5%) of the consumers included in this database never used any membership benefits. The database establishes that out of 567,430 consumers included in the data, only one person purchased any of the following membership benefits:

---

[7]    Some coupons of nominal value are included in some membership kits.  However, Defendants pitch their reward program as the biggest member benefit and the reward program requires the "member" to contact MWI to use it.

| | |
|---|---|
| $25 Exxon Gas Card | $25 WalMart Gift Card |
| $25 Gas Card Choice A | $25 Babies R Us Gift Card |
| $25 Warner Bros. Certificate | $25 SunCoast Gift Card |
| $25 Hollywood Video Gift Cards | Hickory Farms Offer |
| Lady Footlocker Merchandise Certificate | Sharper Image Coupon |

53.    The database establishes that out of 567,430 consumers only two people bought one

or more of the following:

| | |
|---|---|
| ARCO Gas Cards | $25 Structure Certificates |
| $10 Olive Garden Gift Cards | $25 Bloomingdales Certificates |
| Zales Certificates | |

54.    Out of 567,430 consumers *only three people* bought one or more:

| | |
|---|---|
| $10 Toys R Us Certificates | $25 Borders Gift Cards |
| $25 Barnes and Nobel Gift Certificates | |

55.    Out of the 567,430 consumers, four people bought one or more $25 Toys R Us Gift

Cards or a $10 Applebees Certificates; five bought a GNC Coupon; eight bought a $10 Blockbuster

Gift Card or a $25 Linens-N-Things Gift Card; ten bought a $25 Sam Goody Gift Card, a $25 K-

Mart certificate or a $10 Red Lobster/Olive Garden Certificate; 11 bought a $10 Outback Steak

House Certificate or a $25 Lowes Gift Card; 12 bought a $25 KB Toys Gift Card; 16 bought a Pier 1

Gift Card; 17 bought a $25 Footlocker Certificate; 26 bought a $25 Home Depot Gift Certificate; 28

bought a $25 Sears Certificate; 35 bought a Nordstrom Gift Certificate; 36 bought a $25 TJ MAXX

Certificate; and just 152 people bought a $25 Target gift card.  Equally significant, the most

purchased benefits were purchased by less than one percent of the 567,430 consumers – just 0.4%

(2,250 people) received one or more $40 Hair Cut Rebates and just 0.7% (4,063 people) received

4/$5 Dining Rebates.

56.    As part of its investigation, the Iowa Attorney General sent questionnaires to 400

Iowa residents enrolled in MWI membership programs.  The Iowa Attorney General reported that

most of the consumers who responded indicated that they had never used their membership and none

of those responding said they were satisfied members.

- 19 -

57.    The lack of use of the membership benefits demonstrates that Defendants knew, or should have known, that the people they charged $60-$150 were utterly unaware that they had been charged for and enrolled in the MWI memberships.  Consumers were treating the membership kit as the law allows; they were ignoring it and assuming they had no obligation to the sender of the unordered merchandise.  Defendants charged them and took their money in violation of law.

**Consumer Complaints**

58.    Immediately after the first customers were charged for an MWI membership, Defendants began receiving an enormous number of customer complaints.  These complaints ranged from the consumers having no recollection of ever being told about an MWI program to irate consumers alleging theft and fraud by Defendants.  A simple Internet search for "MemberWorks," pulls up thousands of consumer complaints, including websites such as www.ripoffreport.com, www.consumeraffairs.com and www.uspeakout.com.  Despite receiving such complaints and despite knowing of the existence of a number of Internet sites dedicated to complaining about MWI and its unlawful practices, Defendants took no steps to make sure that their marketing practices were not deceptive.

59.    In addition to complaints directly by consumers, MWI received numerous inquiries by the Better Business Bureau (the "BBB") regarding their practices as they related to customers.  Defendant MWI received an unsatisfactory rating by the BBB due to a pattern of complaints concerning unauthorized charges to consumers' credit cards.  The BBB's website reported on June 30, 2006 that it had processed a total of 2,277 complaints about MWI in the previous 36 months, including 765 in the previous year.  The conduct giving rise to these complaints continues.  Almost one year later, on June 2, 2007, the BBB's website reported that it had processed a total of 2,180 complaints about MWI in the previous 36 months, including 667 in the previous year.

60.     Defendants received so many complaints from consumers that they scripted responses to "frequently asked questions" or "FAQ's" for their customer service representatives.    The following "frequently asked questions" were received by Defendants who prepared scripted responses to them:

        (a)     "I received my credit card bill and saw this Essentials or Home & Garden Rewards program listed here for $84 – what is this";

        (b)     "I don't remember hearing about Essentials or Home & Garden Rewards";

        (c)     "I said 'no' to this program";

        (d)     "I didn't authorize this program"; and

        (e)     "Who authorized this billing/purchase?"

61.     The conduct of each of the Defendants contributed to the scheme designed to deceive and defraud class members, resulting in the unlawful assessment of an unsolicited annual recurring membership fee.

**Governmental Actions**

62.     Every governmental and judicial entity to review Defendants' telemarketing practices has concluded they are deceptive and misleading.

63.     Seven attorneys general (from Minnesota, New York, Nebraska, California, Florida, Ohio and Iowa) have separately concluded that the telemarketing scheme Defendants employed was deceptive.  In the words of the Minnesota Attorney General:

> "They just say at the end of the script so we're going to send you the package in the mail ok and they never say Is it OK to charge your credit card? . . .  [The Telemarketers] tell you that the deal is about you getting something for nothing . . . . You're going to get a free gift, you're going to get a risk-free membership and that's not what the real deal is.  The real deal is you're going to get charged unless you act to cancel that."[8]

--------

[8]     *Why Some U.S. Flag Buyers Are Seeing Red*, ABC News.com, Nov. 28, 2001.

64.    According to the New York Attorney General:

Consumers may be confused and mistakenly believe that (1) their credit card or bank card accounts will not be debited unless they directly provide their billing information to MW; (2) they do not have to take any affirmative action to avoid being charged a membership fee; (3) they do not have to take any affirmative action to avoid being charged a renewal fee upon expiration of the initial membership term; and (4) they are not making a purchasing decision at the time of the telemarketing call.

65.    The New York Attorney General also charged that:

Because the trial offer is termed "risk free," Consumers may be confused or fail to understand that they will be charged a membership fee unless they cancel their membership before the end of the trial offer. By reason of the foregoing, the Attorney General believes that MW has engaged in business conduct that has the tendency and capacity to be deceptive and misleading in violation of New York's consumer protection laws.

66.    As a result of the Minnesota and New York Attorneys General investigations, MWI was forced to stop reading its scripts to Minnesota and New York consumers until the scripts were revised to: (1) inform consumers that they would be billed after 30 days if they did not call to cancel; and (2) ask the consumers' permission to charge their credit and/or debit cards. While in 2001 MWI ultimately revised the scripts in Minnesota and New York, it did not include similar disclosures on any of its scripts read in any other state.

67.    Following on the Minnesota and New York investigations, the Nebraska Attorney General implemented an investigation into the deceptive telemarketing practices and came to the same conclusions as the Minnesota and New York Attorneys General investigations. As a result, MWI was required to modify its scripting nationwide to inform consumers that they would be charged after 30 days if they did not call to cancel and to ask their permission to charge their credit and/or debit cards. The new scripting requirements were referred to as "Best Practices" requirements or "Best Practices" scripting. Prior to the June 1, 2001 deadline for implementing the Best Practices scripting, MWI tested the disclosures on several "bait" products. The results were dramatic as affirmative responses to the telemarketing script dropped to nearly zero. In response to

the test results, MWI secured an extension of the implementation date, and returned to using the old deceptive scripting to maximize their "sales."

68.    In 2001, MWI also entered a settlement with the California Attorney General relating to the sale of MWI memberships to consumers who called to purchase unrelated products from Sears.  Under the settlement, MWI agreed to pay an unprecedented $2 million fine.  MWI also agreed to use the Best Practices scripts in California, and to send renewal notices to California residents that they would be charged unless they called to cancel.

69.    On information and belief, in order to circumvent the scripting requirements required by the Nebraska, Minnesota, New York, Florida and California Attorneys General, MWI hatched a scheme to allow it to continue its deceptive telemarketing practices.  Without discussing the matter with any of the attorneys general, MWI and certain of the Telemarketers took the position that the Best Practices requirements did not apply to enrollments originated by the Telemarketers.  This meant that while Best Practices scripting would have to be used where MWI simply paid a fee to the Telemarketers to read the scripts and where consumers were enrolled under the joint venture arrangements with the Telemarketers, the old deceptive scripting would continue to be read by Telemarketers having wholesale arrangements with MWI.  Certain of these Telemarketers would then turn around and "sell" the enrolled consumers back to MWI who would bill the credit and/or debit cards of consumers for the bogus memberships.

70.    On October 21, 2003, the Florida Attorney General filed a complaint concerning Defendants' deceptive telemarketing practices. Noting that MWI reported annual revenue of $400 million, the Florida Attorney General's Office indicated its investigation estimated that 50% of all sales were reported as "unauthorized."  In 2004, MWI also entered into a settlement agreement with the Florida Attorney General relating to the sale of its products in conjunction with unrelated infomercial products.  MWI agreed to pay a $950,000 fine.  The agreement also required MWI to

clearly disclose all terms and conditions of its programs, and to obtain consumers' express consent to charge their credit cards for MWI programs.

71.     The Iowa Attorney General filed suit on May 11, 2006.

72.     As part of its investigation, the Iowa Attorney General sent questionnaires to 400 Iowa residents enrolled in MWI membership programs.  Among the questionnaire respondents, 67% indicated that they did not know they were members and/or that they did not authorize MWI to charge them.  The Iowa Attorney General reports that: "Most of the rest of the consumers who responded indicated that they had never used their membership, or thought that they had already cancelled.  None of those responding said that they were satisfied members."

73.     In 2002, the Federal Trade Commission (the "FTC") published its Notice of Proposed Rulemaking (the "Notice") pertaining to telemarketing sales rules stating "in many preacquired account telemarketing solicitations, products and services (often buyers' clubs) are marketed through the use of free trial offers, which are presented to consumers as 'low involvement marketing decisions.'"  *See* 67 Fed. Reg. 4492, 4501 (Jan. 30, 2002).  The Notice went on to state, "[c]onsumers are asked merely to consent to the mailing of materials about the offer.  Consumers frequently do not realize that the seller or telemarketer already has their billing information in hand and, instead, mistakenly believe they must take some action before they will be charged – *i.e.*, that they are under no obligation unless they take some additional affirmative step to consent to the purchase."  *Id*.

74.     In 2003, the FTC enacted rules to combat "abusive telemarketing . . . practices" by telemarketers using a "free-to-pay conversion feature" when the telemarketers have "pre-acquired account information."  *See* 16 C.F.R. §310.4.  Significantly, in adopting these rules, the FTC included defendant MWI among a list of "bad actors" charged with engaging in this type of abusive telemarketing practices.  68 Fed. Reg. 4580, 4621, n.472 (Jan. 29, 2003).  The rule sets forth three

objective requirements which, at a minimum, must be satisfied to meet the FTC's informed consent requirement. MWI would have had to "obtain *from the customer*, at a minimum, the last four (4) digits of the account number to be charged." 16 C.F.R. §310.4(a)(6)(i)(A). It would have had to "obtain *from the customer* his or her express agreement *to be charged* for the goods or services *and to be charged using the account number* [identified by the customer]." 16 C.F.R. §310.4(a)(6)(i)(B). And MWI would have had to "make and maintain an audio recording of the entire telemarketing transaction." 68 Fed. Reg. 4580, 4621 n.471 (Jan. 29, 2003). In order to circumvent these requirements, MWI began charging $1 for the 30-day trial so that at the end of 30 days, there would not be a "pay to pay" conversion.

75.    In connection with the rule-making proceedings, MWI submitted a purported consumer survey on the understandability of the telemarketing scripts. The FTC concluded that MWI's survey was biased in its favor and that even in the face of this bias, the study demonstrated that "at least 46 percent of the respondents did not even 'mostly' understand the way in which they would be billed after listening carefully to a sales offer involving preacquired account information and a 'free-to-pay conversion' feature." 68 Fed. Reg. 4580, 4621 n.468 (Jan. 29, 2003).

76.    In the *Sanford* Federal Class Action, after weighing the evidence and expert testimony submitted, the federal arbitrator concluded:

> When I look at the overall picture here from an objective reasonable person viewpoint I consider: the experience that MWI has had in thousands of these cases, the circumstances of this type of call (an unsolicited, unexpected offer read by MWI with high sounding words such as "RISK-FREE" membership – "YOU WON'T BE BILLED" – "So, look for this kit in the mail, OKAY?"), *I conclude that even if the script was read to [the consumer], [they were] misled, [they] didn't agree to this "deal," there was no meeting of the minds*, and MWI not only could suspect, but knew that many of the callers did not understand that they were making a "deal" to purchase a membership and assuming a burden to act.

Arbitration Award at 6-7.

77.    In reaching this conclusion, the arbitrator stated: "I conclude that the script has fuzzy language, would have been read in less than 30 seconds (my estimate) as a fast sell over the phone for a product that had nothing to do with the purpose of [the consumer's] call.  The script, if it was read to [the consumer], was ***foisted upon [them] in a quick, slick and misleading sales pitch that few people would understand***."  *Id.* at 7.  Ultimately, he found: "***This script is a recipe for misunderstanding and confusion when heard by a consumer hearing it under the circumstances***."  *Id.* at 8.

78.    In the *Ritt* action, the Ohio Court of Appeals found that the upsell scripts were deceptive and misleading:

> The fact is, with or without authorization, consumers who stayed on the telephone line long enough to receive the entire scripted pitch would not have known the ramifications of what they were agreeing to once the upsell had been pitched to them and they said "yes" to receiving a membership kit.[9]

## TOLLING OF THE STATUTE OF LIMITATIONS

79.    The running of any applicable statutes of limitation has been tolled for several reasons.

**Tolling by Virtue of Defendants' Fraudulent Concealment**

80.    Through various techniques and devices of secrecy, deception and misrepresentation, Defendants affirmatively and intentionally concealed the existence of their unlawful and unfair telemarketing practices from plaintiff, class members and the public.  The fraudulent concealment, deception and misrepresentation existed before plaintiff was enrolled and charged and continued throughout the class period.  Defendants carried out their violations of law in secret and consistently deceived, misrepresented and concealed the truth regarding the unauthorized enrollment into the various membership programs and the unauthorized charging of plaintiff's and class members' credit

---

[9]    *Ritt v. Billy Blanks Enters.*, No. 80983, 2003 Ohio App. LEXIS 3297, at *7, *20-*21 (Ohio Ct. App. July 10, 2003).

and/or debit cards. Such acts included purposely designing their scripts to maximize consumers' confusion, thus allowing Defendants to enroll the maximum number of unsuspecting consumers.

81.    Defendants' scheme is based upon their knowledge that a large segment of the consumer population does not check their credit card statements and/or would miss the charge even if they did review their credit card statement.

82.    So as to assuage any suspicion that a consumer may have, Defendants emphasize that the trial membership they are sending is "FREE" and that the class members "WON'T BE BILLED."

83.    To conceal the fact of billing consumers' credit and/or debit cards, Defendants intentionally did not send plaintiff or class members any invoice or any other notification that they were going to charge their cards. Similarly, to conceal the true facts concerning the billing of the consumers' credit and/or debit cards, after they billed the consumers' credit and/or debit cards, Defendants did not send any invoice, or notification of the fact that they had in fact billed the class members' cards.

84.    Another method that Defendants used to conceal their wrongful practices from plaintiff and the class was to reverse the charges for any consumer that was able to track down the source of the illicit charge and called to complain. After reading scripts in an attempt to keep the consumer enrolled, Defendants and/or their agents would reverse the charges for complaining consumers so that the complaints did not get escalated to the point that their practices became common knowledge and reached the ears of the consumers they illicitly enrolled in, and charged for, the bogus programs. Further evidence of this concealment is demonstrated by the existence of a Frequently Asked Questions script providing their telephone operators and/or operators of their agents, with scripted answers to consumer questions/statement such as "I did not authorize this charge," "how did you get my credit card number" and "what is this program," among others.

85.     To further conceal their wrongful conduct from those consumers who did review their credit card statements, Defendants intentionally charged between $60 and $150 – amounts that were unlikely to rouse suspicion from the consumer and provoke any further inquiry.  Indeed, had Defendants billed the consumers' credit and/or debit cards for several hundred dollars, consumers would be more likely to notice the illicit charges and seek to have them reversed.  Similarly, the identification of the charges was designed to conceal the illicit nature of the subject charges, as the charges were identified by such words as "Essentials," "Value Max" and "Home and Garden," among others.  A consumer who reviewed his or her statement seeing a charge for $75 to "Essentials," for example would likely perceive such name to be a clothing store, curio store, drug store or other retail establishment from which his or her spouse would have made a purchase, and thus not pursue any further inquiry to determine if the charge was legitimate or fraudulent.

86.     Through such acts of fraudulent concealment, even assuming that a class member noticed the charge on their credit or debit card statement, the existence of a charge for Essential, Value Max, Home & Garden or others would not provide any indication to the class member that their card was fraudulently charged.

87.     Defendants' scheme worked perfectly on plaintiff and the class members.  Succumbing to Defendants' practices of fraudulent concealment described above, plaintiff Waslin did not notice the fraudulent charge when he was originally enrolled, and charged, by Defendants.  Plaintiff Waslin contacted MWI inquiring about suspicious charges to his debit card.  Plaintiff Waslin was or may have been refunded the most recent charges, but was never informed of all or any previous charges.

88.     By virtue of their pervasive deception and misrepresentation and concealment of facts, Defendants successfully concealed from plaintiff and class members the truth about the memberships thereby tolling the running of any applicable statutes of limitation.  Plaintiff and class

members were unaware of, and through the exercise of due diligence could not have discovered, the existence of such violations until after they had been charged for the membership.

89.    In the alternative, based on the facts alleged herein, Defendants are estopped from relying on any statutes of limitation because of their fraudulent concealment, deception and misrepresentation of facts regarding the enrollment into the membership programs and unauthorized charges.  They were under a duty to disclose this information because it is non-public information over which Defendants had exclusive control, because Defendants knew this information was not available to plaintiff and class members and because this information was crucial to the consuming public in making purchasing decisions.

**Tolling by Reason of Prior Class Action Pending**

90.    This is a related case to the *Sanford* Federal Class Action.  The *Sanford* Federal Class Action was filed on March 28, 2002.  In addition to federal claims, the *Sanford* Federal Class Action originally included state law claims.  The state law claims were finally dismissed from the federal action on December 23, 2008.  Under established case law, the filing of the *Sanford* Federal Class Action against MWI tolls all statutes of limitation until a final judgment of dismissal, which is no longer subject to additional appeals, has been entered.

91.    The court in the *Sanford* Federal Class Action issued an order on September 29, 2008, granting defendants' motion to dismiss the federal claims, and refusing to exercise supplemental jurisdiction over plaintiff Patricia Sanford's and the class members' state law claims.  Furthermore, relying on *Wright v. Schock*, 742 F.2d 541, 545 (9th Cir. 1984) (citing *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 352-53 (1983)), the federal court held the pendency of the federal action "tolled the statute of limitations for individual claims, mitigating prejudice to members of the putative class."

92.     On October 14, 2008, plaintiffs filed an *ex parte* application for reconsideration, asking the federal court for leave to amend the complaint, which application was granted on November 3, 2008, directing plaintiffs to file a motion for leave.  On November 17, 2008, plaintiffs filed the motion for leave to amend.  On December 16, 2008, defendants filed an *ex parte* motion to dismiss or, in the alternative, to strike, among other things, the state law claims from the proposed amended federal complaint, arguing that "the Court previously dismissed numerous state law claims without prejudice, and thus the state law claims can be pursued in the appropriate state court(s)." MemberWorks Inc.'s Memorandum of Points and Authorities in Support of *Ex Parte* Application for Dismissal or, in the Alternative, to Strike Claims and Additional Parties at 8.  On December 23, 2008, the federal court struck the state law claims from the proposed amended complaint, holding: "Furthermore, dismissing the action would not preclude Plaintiffs from pursuing relief in other venues.  The Court has not precluded the Plaintiffs from pursuing its state law claims in state court." Order Striking Counts I, IX, X, and XI from the Proposed TAC Attached to Plaintiffs' Motion for Leave to Amend at 4.

93.     As the above facts establish, Defendants have at all times known the core facts concerning the claims for which plaintiff and the class members seek to hold them accountable. Defendants have also known that at no time has plaintiff ever intended to drop the claims asserted against them.  Accordingly, there is no prejudice to Defendants in permitting plaintiff and the class members to proceed with this action and prosecute their rights against Defendants.

## CLASS ACTION ALLEGATIONS

94.     Plaintiff brings this action on behalf of himself and all other persons similarly situated.  The class which plaintiff represents is composed of all persons in the United States who, after calling a telephone number to inquire about or purchase another product: (1) were sent a membership kit in the mail; and (2) charged for an annual MWI membership program (the "Class").

Excluded from the Class are all persons enrolled in an MWI program under the March 16, 1998 "Joint Marketing Agreement between West Telemarketing Corporation and MemberWorks Incorporated," and/or the January 1, 1999 "Agreement" between West Telemarketing Corporation and MemberWorks Incorporated, and/or the July 1, 1999 "Joint and Wholesale Marketing Agreement" between West Telemarketing Corporation, West Teleservices Corporation and MemberWorks Incorporated and/or the December 1, 2001 "Wholesale and Retail Marketing Agreement" between MemberWorks Incorporated and West Direct, Inc., and any amendments or addendums to these agreements.[10] Not included within the Class are Defendants and their officers, directors, employees, agents and/or affiliates.

95.    The Class is composed of hundreds of thousands of persons geographically dispersed throughout the country, the joinder of whom in one action is impracticable, and the disposition of their claims in a class action will provide substantial benefits to both the parties and the Court.

96.    The Class is ascertainable and maintains a sufficient community of interest since the rights of each member of the Class were violated in a similar fashion based upon Defendants' use of a uniform script that was read to the class members.

97.    The victimized consumers can be identified in the databases maintained by MWI. More specifically, MWI maintains databases that contain the following information: (1) the name of each class member "enrolled" in an MWI program via an inbound call; (2) the address of each such class member; (3) the dates each class member was enrolled; (4) the date and amount each class member was charged; and (5) the date and amount each class member was refunded. Thus the class

---

[10]    The identities of the consumers encompassed by this exclusion are identified on Exhibit A to the Declaration of Markham Sherwood Re Mailing of Notice and Claim Form, Report on Opt-Outs and Objections Received, filed in the *West* Action in support of plaintiffs' final approval of settlement.

members can be located and notified with specificity of the pendency of this action using techniques and a form of notice customarily used in class action litigation.

98.     Plaintiff's claims are typical of the members of the Class as a whole because of the similarity, uniformity and common purpose of the unlawful conduct of Defendants.  Each class member was read the subject "upsell" script.  Each class member was mailed a membership kit for an MWI membership program.  Each class member has sustained damage as a result of Defendants' wrongful conduct in violation of state statutes, state common law, as well as general principles of equity and fair play.

99.     Plaintiff will fairly and adequately protect the members of the Class as plaintiff has retained competent counsel who are experienced in federal and state class action claims such as those asserted in this case.

100.    A class action is superior to all other methods for the just, fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the damages suffered by individual class members are not sufficient to justify the enormous cost associated with the prosecution of this type of litigation.  The expense and burden posed by such individual litigation makes it impossible for the class members to individually redress the wrong done to them, nor would such an individual case be adequate to ensure that such practices cease to harm others.  Further, there will be no difficulty in the management of this action as a class action.

101.    Common questions of law and fact exist as to all members of the Class and these common issues predominate over any questions which go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

(a)     did Defendants mail memberships to the class members without obtaining prior express consent or acceptance;

(b)     were the subject "upsell" scripts deceptive;

(c)    did Defendants clearly and unambiguously communicate that the class members would be charged unless they called Defendants to cancel the "risk-free" trial membership;

(d)    were the membership materials deceptive;

(e)    did Defendants act willfully or recklessly;

(f)    did Defendants' acts, as alleged herein, violate federal statutes, Connecticut common law or statutes and/or general principles of equity and fair play;

(g)    what amount of damages has the Class sustained as a result of Defendants' wrongful conduct, and the proper measure of such damages; and

(h)    what restitution is due class members.

## COUNT I

**For Violations of the Electronic Fund Transfer Act, 15 U.S.C. §1693 *et seq.*
(On Behalf of Plaintiff and the Members of the Class)**

102.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-101 above.

103.    MWI charged plaintiff Waslin's debit card on August 22, 2002, September 18, 2002, September 25, 2002 and October 15, 2002.  At no time did MWI secure oral authorization, let alone written authorization, to levy such charges.  Accordingly, Waslin has standing to assert this count on behalf of himself and to act as class representative and represent the interests of the unnamed class members whose debit and/or credit cards were similarly charged by MWI without having first obtained written authorization to levy such charges.

104.    The purpose of the Electronic Fund Transfer Act ("EFTA") is "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems."  15 U.S.C. §1693(b).  The primary objective of the EFTA "is the provision of individual consumer rights."  *Id.*

105.    The EFTA provides that "[a] preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. §1693e(a). "In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the . . . designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with the regulations of the Board, of the amount to be transferred and the scheduled date of the transfer." 15 U.S.C. §1693e(b).

106.    Defendants engaged in "unauthorized electronic fund transfers," as that term is defined in 15 U.S.C. §1693a(11), by debiting consumer's bank accounts without the consumer's actual authorization. As alleged herein, Defendants failed to comply with their duties under the EFTA because they initiated electronic fund transfers from the class members' accounts without obtaining authorization in writing.

## COUNT II

### For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) and 1964(c) – Credit Card Fraud Enterprise (Participation in an Enterprise) (On Behalf of Plaintiff and the Members of the Class)

107.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-106 above.

108.    This claim for relief arises under 18 U.S.C. §§1962(c) and 1964(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which provide:

18 U.S.C. §1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

109.    **Person**: At all relevant times, defendant MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

110.    **Enterprise**: At all relevant times, MWI (described in ¶111(a)), the Telemarketing Entities (described in ¶111(b)) and the Bait Product Suppliers (described in ¶111(c)) constitute the "Credit Card Fraud Enterprise" – an enterprise within the meaning of 18 U.S.C. §1961(a), and together constitute an "enterprise in fact" within the meaning of 18 U.S.C. §1961(4).  MWI, the Telemarketing Entities and the Bait Product Suppliers intentionally agreed to levy, and did levy, illicit credit and debit card charges on plaintiff and the class members for a bogus membership product after the plaintiff called to purchase unrelated products offered for sale by the Bait Product Suppliers.  The Credit Card Fraud Enterprise intentionally was constructed through meetings and agreements between MWI, the Telemarketing Entities and the Bait Product Suppliers.  The participants included representatives of MWI, representatives of the Telemarketing Entities and representatives of the Bait Product Suppliers.  MWI has intentionally participated in the enterprise, and helped to direct the enterprise's actions and manage its affairs.  MWI intentionally conducted or participated, directly and/or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  MWI's pattern of racketeering activity dates from at least January 1, 1998 and continues to the present, and threatens to continue in the future.

111.    The roles of the participants of the Credit Card Fraud Enterprise are as follows:

(a)    **MWI**: Defendant MWI was and is the king-pin of the enterprise.  MWI intentionally created the scheme.  MWI intentionally conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs, and helped to direct the enterprise's actions and manage its affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  In exchange for a portion of the proceeds, MWI intentionally induced the Telemarketing Entities to agree to identify

their clients (the Bait Product Suppliers), who would have an available pool of consumers upon whom the participants in the enterprise could subject to the credit and debit card fraud alleged. MWI intentionally developed the deceptive telemarketing scripts and the bogus "membership kits." MWI intentionally caused the deceptive telemarketing pitch to be read to plaintiff and the class members. MWI intentionally received the credit and debit card information, transmitted via the wires from the Telemarketing Entities, and used that confidential financial information to levy fraudulent charges on plaintiff's and the class members' credit and debit cards. MWI intentionally billed the class members' credit and debit cards using the wires, and delivered the bogus membership kits via the U.S. mail. MWI intentionally used that confidential information to levy illicit "renewal" charges on the cards of plaintiff and the class members every 11 months, until such time as the class member noticed the charge and called to complain. MWI intentionally distributed the illegally obtained proceeds to the Telemarketing Entities and the Bait Product Suppliers via the mail and wires.

(b)    *The Telemarketing Entities*: The Telemarketing Entities intentionally colluded with MWI and their clients who were selling products to consumers via infomercials (the Bait Product Suppliers), to gain access to the consumers who purchased these bait products. The Telemarketing Entities intentionally read and caused to be read the deceptive telemarketing scripts to plaintiff and the class members. The Telemarketing Entities also intentionally collected the class members' confidential credit and debit card information in connection with the sale of the "bait" product and transferred that confidential information via interstate wire to MWI who used that information to illicitly bill the class members' credit and debit cards (also by interstate wire). At this time, without the benefit of discovery, plaintiff understands that Convergys Corporation is one of the Telemarketing Entities. The identities of the other Telemarketing Entities who are participants in the enterprise are known by MWI, and will be revealed through discovery.

       (c)    ***The Bait Product Suppliers***: In return for a fee paid to them for each customer fraudulently enrolled in a bogus MWI membership program, the Bait Product Suppliers intentionally directed the Telemarketing Entities transmit to MWI, the confidential credit card and debit card information obtained from the class members who called to purchase the bait product. At this time, without the benefit of discovery, plaintiff is aware of the identities of the following entities who plaintiff understands are Bait Product Suppliers and/or bait products who are participants in the enterprise:

| | |
|---|---|
| Ambitious Ideas Inc. | Cspot Run |
| Bionic Buddies | Donovan Group |
| Renosky Lure Corp. | Entertainment America |
| CEMPSI & Telecom | Fleet Bank |
| Contour Pillow | Fredrickson Television |
| Copa | Fresh Start Marketing |
| GRSN | Product Partners |
| Harris Publishing | HZL |
| Infomarketing Group | Infotopia |
| Media Group | Merchant Services |
| Modern Media | Morris International |
| NSI | Speedway Motorsports |
| Sylmark | Talk America |
| Tasmark | Tru-Star Global |
| TV Media | Value Center |
| Valuevision | Wave Communications |
| Williams Direct | WNR-Direct Response |

The identities of the other Bait Product Suppliers who are also participants in the enterprise are known by MWI, and will be revealed through discovery.

       112.    The Credit Card Fraud Enterprise functioned as a continuing unit to intentionally mislead plaintiff and the class members through the deceptive telemarketing practices alleged in order to illegally and fraudulently extract payment of money from the class members for bogus MWI membership products they did not order or authorize, and to levy illicit renewal charges on the class members through the date of this Complaint. The enterprise has an ascertainable structure and purpose separate from MWI's predicate acts.

113.    The Credit Card Fraud Enterprise was an ongoing and continuous organization whose members have been in frequent communication regarding furthering the fraudulent scheme, the methods and means of maximizing the fraudulent charges, coordinating strategy and suppressing the truth about the fraudulent telemarketing scheme.

114.    ***Pattern of Racketeering Activity***: MWI has been associated with and participated in the affairs of the Credit Card Fraud Enterprise.  MWI intentionally helped to direct each enterprise's actions and manage their affairs.  MWI intentionally conducted or participated, directly or indirectly, in the conduct of the Credit Card Fraud Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c), involving multiple and intentional acts of mail fraud and wire fraud in violation of 18 U.S.C. §§1341 and 1343.  Defendants' pattern of racketeering activity dates from at least January 1, 1998 to the present.

(a)    Defendants intentionally made the deceptive telemarketing pitch to plaintiff Waslin on or about August 12, 2002 and levied a fraudulent charge of $96.00 to his debit card on September 18, 2002.  Defendants also made the same intentional deceptive telemarketing pitch to Waslin in connection with his purchase of a different bait product on or about July 15, 2002 and levied a second fraudulent charge of $1.00 to his debit card on August 22, 2002 and a third fraudulent charge of $149.95 to his debit card on September 25, 2002.  Defendants also made the same deceptive telemarketing pitch to Waslin in connection with his purchase of a different bait product on or about September 10, 2002 and levied a fourth fraudulent charge of $96.00 to his debit card on October 15, 2002.

(b)    With respect to the unnamed class members, at this time, without the benefit of discovery from Defendants, plaintiff is aware of at least 480,810 additional separate acts of fraudulent telemarketing and illicit charging of the class members' credit and debit cards.  As stated above, plaintiff is in possession of information identifying the name of the class member, city and

state from where the call was made, and the date and amount of the fraudulent telemarketing charge (which is covered by a protective order). Plaintiff expects that more than a million additional such fraudulent charges are known to MWI, and will be revealed through discovery.

(c)     At this time, without the benefit of discovery from Defendants, plaintiff is aware that the earliest telemarketing pitch was made on March 12, 1998, and that the earliest fraudulent charge occurred on April 29, 1998. As stated above, plaintiff is in possession of information identifying the name of the class member, city and state from where the call was made, and the date and amount of the fraudulent telemarketing charge which is covered by a protective order. At this time, without the benefit of discovery from Defendants, plaintiff is aware that the most recent telemarketing pitch was made on or about September 10, 2002, and that the most recent fraudulent charge occurred on October 15, 2002. Based upon a database MWI produced in the related California state court action, plaintiff is aware that the most recent fraudulent charge to a West Subclass member[11] was levied on March 9, 2007 – the month that the database was produced. Accordingly, based upon this information, plaintiff believes that discovery will reveal a continuation of the pattern and practice of fraudulently charging the credit and debit cards of the class members in this action, through at least March 2007, through the present, and for the foreseeable future.

(d)     At this time, without the benefit of discovery from Defendants, plaintiff is aware that MWI has levied at least $32,494,964.22 in intentional and fraudulent charges to the class members' credit and debit cards. As stated above, plaintiff is in possession of information identifying the name of the class member, city and state from where the call was made, and the date and amount of the fraudulent telemarketing charge which is covered by a protective order. Plaintiff

---

[11]     As noted above, the claims of the West Subclass members were severed from this action and subsequently settled with West and this action seeks no recovery for these dismissed West Subclass members.

expects that tens of millions of dollars in additional such charges are known to MWI, and will be revealed through discovery.

(e)    In short, even without discovery from Defendants, plaintiff is aware: (i) that the earliest act of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) occurred on March 12, 1998; (ii) that the most recent act of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) occurred on March 9, 2007; (iii) that acts of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) occurred on a daily basis from at least March 1998 through March 2007; (iv) that acts of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) have occurred to the present; and (v) that the acts of racketeering (mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343) resulted in the theft of at least $32 million and that discovery will reveal that tens of millions of dollars in additional damage to the Class.

115.    MWI's acts of racketeering include multiple intentional acts of mail and wire fraud in violation of 18 U.S.C. §§1341 (mail fraud) and 1343 (wire fraud).  MWI intentionally engaged in schemes to defraud plaintiff and members of the Class.  Those schemes involved, *inter alia*, intentionally levying illicit charges to the class members' credit and debit cards for a purportedly free gift and levying illicit renewal charges every 11 months thereafter. The Credit Card Fraud Enterprise's intentional misrepresentations and fraudulent concealment of material facts include misrepresentations and fraudulent concealment of the fact that the free gift the class members would purportedly receive was neither free, nor a gift, and instead the class members would be charged for it, even though MWI never asked permission to charge plaintiff and the class members for the bogus membership products.

116.    The Credit Card Fraud Enterprise intentionally committed mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343 in executing and/or attempting to execute such schemes

through the use of interstate transmissions by wire (reading the deceptive telemarketing scripts to persons who telephoned to purchase the unrelated bait products and electronically processing fraudulent credit card and debit card transactions) and through the use of the United States mail (mailing purported membership kits to consumers).  More particularly, the Credit Card Fraud Enterprise's predicate acts of mail and wire fraud include:

(a)    Using interstate wires, MWI and the Credit Card Fraud Enterprise falsely and intentionally informed plaintiff and the class members that they were being sent a free 30-day trial membership and that they would not be billed;

(b)    Using interstate wires, MWI and the Credit Card Fraud Enterprise intentionally and illicitly charged the class members' credit and/or debit cards without ever asking or receiving permission to do so;

(c)    Using interstate wires and the U.S. mail, MWI and the Credit Card Fraud Enterprise communicated with each other regarding the method of undertaking their deceptive telemarketing scheme (as well as the implementation and day-to-day operation of the scheme), as well as negotiating the split of the illicit profit they would make;

(d)    Using interstate wires and U.S. mail, MWI and the Credit Card Fraud Enterprise intentionally distributed the illegally obtained gains they had received from plaintiff and the class members to the members of the enterprise; and

(e)    Using interstate wires and the U.S. mail to distribute the proceeds of unlawful activity and otherwise to promote, manage, establish, carry on or facilitate the promotion, management, establishment or carrying on of unlawful activity in violation of 18 U.S.C. §1952.

117.    The racketeering acts of the Credit Card Fraud Enterprise also include engaging in monetary transactions involving the proceeds of crime in violation of 18 U.S.C. §1957(a), which prohibits "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally

derived property that is of a value greater than $10,000 and is derived from specific unlawful activity," including mail and wire fraud, and 18 U.S.C. §1956(c)(7)(A), which prohibits conducting or attempting to conduct a financial transaction involving the proceeds of an unlawful activity. MWI and the Credit Card Fraud Enterprise intentionally engaged in monetary transactions in criminally derived property to distribute amongst themselves millions of dollars of illegally obtained credit and debit card charges.

118.    These predicate acts form a "pattern" of racketeering activity. They are related in their common objectives of maximizing revenues derived from the sale of MWI membership products, maximizing repeat "renewal" charges for the bogus products, misleading the public and government regulators that have responsibility for protecting consumers and policing telemarketing fraud. These racketeering acts have had the same or similar purposes, results, participants, victims and methods of commission. The acts have been, and are capable of being regularly repeated.

119.    *Affect on Interstate Commerce*: The Credit Card Fraud Enterprise has engaged in, and its activities have affected, interstate and foreign commerce. MWI continues to date to carry out the goals of the enterprise, including concerted activities to disguise the nature of its wrongdoing, to conceal the proceeds thereof and to conceal its participation in the enterprise in order to avoid and/or minimize its exposure to criminal and civil penalties and damages.

120.    *Time Period*: The Credit Card Fraud Enterprise is an ongoing operation whose members have been and remain in frequent communication in order to conduct the enterprise. As more fully alleged in ¶110 above, the enterprise began on or about January 1, 1998, and has obtained illegal "renewal charges" from the class members as late as March 2007. Discovery will reveal that illicit renewal charges have continued to be levied to the present and will continue to be levied in the future. Accordingly, the Credit Card Fraud Enterprise engaged in a continuous pattern of racketeering acts within the last four years.

121.    *Injury to Business or Property*: Plaintiff and the members of the Class have been injured in their business and property by reason of Defendants' and the Credit Card Fraud Enterprise's violations of 18 U.S.C. §§1962(c) and 1964(c), because they have had money and property illegally and fraudulently taken from them.  In the absence of Defendants' violation of these statutes, plaintiff's and the class members' funds would not have been stolen from them.

122.    Under the provisions of 18 U.S.C. §1964(c), plaintiff and the members of the Class have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

### COUNT III

**For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.
§§1962(d) and 1964(c) – Credit Card Fraud Enterprise
(Conspiracy to Violate 18 U.S.C. §1962(c))
(On Behalf of Plaintiff and the Members of the Class)**

123.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-122 above.

124.    This claim for relief arises under 18 U.S.C. §§1962(d) and 1964(c) of RICO, which provide:

18 U.S.C. §1962(d): "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

125.    *Person*: At all relevant times, defendant MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

126.    At all relevant times, MWI, the Telemarketing Entities and the Bait Product Suppliers have constituted the Credit Card Fraud Enterprise described herein.  By intentional use of the mail, wire and Internet, the enterprise and its activities have had an effect on interstate commerce in that

the enterprise is engaged in the business of extracting the illegal charges, the disguised nature of or a "sale" of bogus membership kits and the illegal "renewal" charges for these bogus memberships.

127.    As more fully alleged above, MWI has engaged in a pattern of racketeering activity which dates from January 1, 1998 through the present and threatens to continue in the future. MWI's multiple predicate acts of racketeering are alleged above.  These racketeering acts generated income for Defendants.

128.    In violation of 18 U.S.C. §1962(d), Defendants intentionally combined, conspired and agreed, among themselves and with persons and entities known and unknown to plaintiff and the class members, to conduct and participate, directly or indirectly in the affairs of the Credit Card Fraud Enterprise and acquired an interest and control in this racketeering enterprise and used the proceeds of the racketeering enterprise to acquire an interest in, establish and operate the enterprise.

129.    Plaintiff and the members of the Class have been injured in their business and property by reason of Defendants' conspiracy in violation of 18 U.S.C. §§1962(d) and 1964(c) because they have had money and property illegally and fraudulently taken from them.  In the absence of Defendants' violation of these statutes, plaintiff's and the class members' funds would not have been stolen from them.

130.    Under 18 U.S.C. §1964(c), plaintiff and the members of the Class have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

## COUNT IV

### For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(c) and 1964(c) – Participation in Regulatory Enterprise (Obstruction of Justice) (On Behalf of Plaintiff and the Members of the Class)

131.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-130 above.

132.    This claim for relief arises under 18 U.S.C. §§1962(c) and 1964(c) of RICO, which provide:

18 U.S.C. §1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

133.    *Person*: At all relevant times, MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

134.    *The Regulatory Enterprise*: At all relevant times, MWI and the Telemarketing Entities have together constituted an additional "enterprise" within the meaning of 18 U.S.C. §§1961(a) and 1961(4).  As described in ¶¶136-139 below, the participants intentionally hid each others involvement in the Credit Card Fraud Enterprise from various attorneys general and other law enforcement agencies who were investigating (and/or who had authority to investigate) the deceptive telemarketing practices, as well as to circumvent consent judgments entered in the attorneys general settlements agreed to by MWI, and regulations imposed by the FTC designed to put an end to the pernicious practice of charging consumers' credit cards without prior authorization.  The Regulatory Enterprise intentionally engaged in meetings between MWI and the Telemarketing Entities.  The participants included employees and officers of MWI and the Telemarketing Entities.  MWI participated in the enterprise and helped to direct the enterprise's actions and manage its affairs.  Defendants intentionally conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).  The Regulatory Enterprise's pattern of racketeering activity dates from at least April 1, 2000 and continues to the present, and threatens to continue in the future.

135.    The roles of the participants of the Regulatory Enterprise are as follows:

(a)    ***MWI***: Defendant MWI intentionally conspired with the Telemarketing Entities to keep their telemarketing scheme secret should there be a governmental investigation into the telemarketing scheme.  In addition, to intentionally circumvent at least four consent judgments to which MWI was subject and was a signatory (but the Telemarketing Entities were not), aimed at putting an end to Defendants' fraudulent practices in California, Minnesota, New York and Nebraska, MWI and the Telemarketing Entities arranged to alter (on paper only) the ownership of the bogus memberships that were sold, to make it appear that MWI was not enrolling the class members.  To this end, MWI caused the Telemarketing Entities to enroll the consumers, and then immediately "sell" the newly enrolled consumers to MWI who would bill the credit and debit cards of consumers for the bogus memberships.  By having the Telemarketing Entities enroll the class members, the Regulatory Enterprise thus intentionally circumvented the restrictions on MWI imposed under the consent judgments.

(b)    ***The Telemarketing Entities***: The Telemarketing Entities participated in the conduct described above, and intentionally agreed to take initial ownership of the memberships and to immediately sell the new memberships to MWI to levy the illicit charges.

136.    The Regulatory Enterprise is an organization whose constituent elements functioned together, and with others, to disrupt and defeat governmental investigations and to circumvent consent judgments by suppressing the truth concerning the intentional and deceptive telemarketing practices of the Credit Card Enterprise, and continue to carry out their scheme to illicitly charge the class members for the bogus membership products they did not order or authorize.  The Regulatory Enterprise has an ascertainable structure and purpose beyond the scope of MWI's predicate acts and the conspiracy to commit such acts. The Regulatory Enterprise exists separate and apart from MWI.

137.    The Regulatory Enterprise is an ongoing organization whose members have been in frequent and intentional communication to coordinate strategy, suppress the truth about MWI's activities and otherwise further the fraudulent telemarketing scheme.

138.    ***Pattern of Racketeering Activity***: MWI has been intentionally associated with the Regulatory Enterprise.  MWI intentionally helped to direct the enterprise's actions and manage its affairs.  MWI intentionally conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c). MWI's pattern of racketeering activity has operated continuously from at least April 1, 2001, and will continue in the future.  MWI has intentionally and illegally taken more than a million dollars in fraudulent charges to the class members' credit and debit cards.  The Regulatory Enterprise's predicate acts of racketeering include:

(a)    Multiple and intentional acts of mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343.  MWI intentionally engaged in schemes to defraud the governmental entities responsible for regulating and prosecuting consumer fraud.  Those schemes have involved, *inter alia*, MWI intentionally conspired with the Telemarketing Entities to keep each other's identity and operation secret in the event governmental investigations and/or enforcement actions were undertaken and purposely circumvented consent judgments entered into on April 18, 2000 with the Minnesota Attorney General, on August 23, 2000 with the New York Attorney General, on February 7, 2001 with the Nebraska Attorney General, on April 27, 2001 with the California Attorney General and on July 1, 2004 with the Florida Attorney General in such law enforcement actions.

(i)    MWI and the Regulatory Enterprise intentionally executed or attempted to execute such schemes by using the mail and the wires (including telephone and electronic mail) to reach agreements with the Telemarketing Entities to keep each other's identity secret in the event governmental investigations and/or enforcement actions were undertaken and

actively circumventing settlements reached with at least four attorneys general in such enforcement actions. This conduct constitutes mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343, and obstruction of justice in violation of 18 U.S.C. §1501 *et seq.*

    (ii)    MWI and the Regulatory Enterprise intentionally executed or attempted to execute such schemes through the use of transmissions by the mail and wires (telephone discussions and e-mail exchanges) in responding to the governmental investigations, and engaged in telephone discussions and e-mail exchanges amongst each other regarding what to tell and/or not tell these governmental officials. This conduct constitutes mail and wire fraud in violation of 18 U.S.C. §§1341 and 1343, and obstruction of justice in violation of 18 U.S.C. §1501 *et seq.*

    139.    ***Affect on Interstate Commerce***: The Regulatory Enterprise has engaged in, and its activities have affected, interstate and foreign commerce. The enterprise continues to date through the concerted activities of Defendants actively disguising the nature of their wrongdoing, to conceal the proceeds thereof and to conceal Defendants' participation in the enterprise in order to avoid and/or minimize their exposure to criminal and civil penalties and damages.

    140.    ***Time Period***: The Regulatory Enterprise is a continuous organization whose members were in frequent communication. It began in April 2001 with the Minnesota Attorney General investigation, and the latest attorney general investigation in which MWI has concealed the existence and role of the Telemarketing Entities was the Iowa Attorney General investigation launched in May 2006. Accordingly, the Regulatory Enterprise has engaged in a continuing pattern of racketeering practices during the last four years

    141.    ***Injury to Business or Property***: Plaintiff and the members of the Class have been injured in their business and property by reason of MWI's violations of 18 U.S.C. §§1962(c) and (d) and 1964(c), because they have had money illicitly taken from them.

142.    Under the provisions of 18 U.S.C. §1964(c), plaintiff and the class members have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

**COUNT V**

**For Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§1962(d) and 1964(c) – Regulatory Enterprise (Conspiracy to Violate 18 U.S.C. §1962(c)) (On Behalf of Plaintiff and the Members of the Class)**

143.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-142 above.

144.    This claim for relief arises under 18 U.S.C. §§1962(d) and 1964(c) of RICO, which provide:

> 18 U.S.C. §1962(d): "It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

> 18 U.S.C. §1964(c): "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. §1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . ."

145.    At all relevant times, MWI was a "person" within the meaning of 18 U.S.C. §1961(3).

146.    At all relevant times, MWI and the Telemarketing Entities constituted the Regulatory Enterprise described above.  Each enterprise and its activities have an effect on interstate commerce in that the enterprise is intentionally engaged in the business of maximizing the illicit charges in the disguised nature of a "sale" of the bogus membership kits, and the illicit "renewal" charges for said bogus memberships, by shielding each other from attorneys general investigations and circumventing consent judgments entered against MWI.

147.    The Regulatory Enterprise is an ongoing organization whose constituent elements function as continuing units. The enterprises have engaged in, or their activities have affected, interstate or foreign commerce.

148.    The Regulatory Enterprise has ongoing existence separate and apart from MWI's racketeering acts. The members of these enterprises operate as continuing units with a hierarchical or consensual decision-making structure.

149.    Beginning in April 2000, MWI intentionally conspired with the Telemarketing Entities to circumvent consent judgments entered between MWI and the Minnesota, New York, Florida, California and Nebraska Attorneys General.  As more than two acts took place over a ten year time span, these acts form a obstruction of justice.  They have been related in their common objectives of intentionally maximizing sales of MWI membership products, maximizing repeat "renewal" charges for the bogus products, misleading the public and government regulators which bear responsibility for protecting consumers and policing telemarketing fraud.  These acts have had the same or similar purposes, results, participants, victims and methods of commission.  The acts have been consistently repeated and are capable of future repetition.

150.    In violation of 18 U.S.C. §1962(d), MWI intentionally combined, conspired and agreed, among themselves and with persons and entities known and unknown to plaintiff and the class members, to conduct, operate and participate, directly or indirectly in the affairs of the Regulatory Enterprise and acquired an interest and control in this racketeering enterprise.

151.    Plaintiff and the class members have been injured in their business and property by reason of Defendants' conspiracy to violate 18 U.S.C. §1962(c) and (d) in that plaintiff and the class members' funds would not have been stolen from them.

152.    Under the provisions of 18 U.S.C. §1964(c), plaintiff and the class members have standing and are entitled to bring this action and to recover herein treble damages, the costs of bringing this suit and reasonable attorneys' fees.

## COUNT VI

### For Violation of Connecticut General Statutes §42-110a *et seq.*
### (On Behalf of Plaintiff and the Members of the Class)

153.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-152 above.

154.    This claim arises under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §42-110a *et seq.*

155.    Conn. Gen. Stat. §42-110g(a) permits any person who suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by CUTPA to bring an action to recover actual damages.

156.    Defendants have acted, as alleged herein, in the conduct of trade or commerce.

157.    Connecticut has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.

158.    At all times relevant, Defendants engaged in deceptive acts, omissions, conduct or misrepresentations as part of trade or commerce within the State of Connecticut and/or had an impact within the State of Connecticut as defined in Conn. Gen. Stat. §42-110a(4).  MWI was a seller of product to plaintiff and class members and plaintiff and class members suffered substantial loss because of one or more of Defendants' deceptive acts or omissions

159.    The acts, omissions, misrepresentations, policies, practices and non-disclosures of Defendants as alleged herein were intentional, malicious, immoral, unethical, unscrupulous or oppressive and constituted violations of CUTPA, Conn. Gen. Stat. §42-110a *et seq.*

160.    The policies, acts and practices of Defendants as described above were intended to deceive, deceived and continue to deceive plaintiff, members of the Class, and the general public as described herein and have resulted (and will result) in annual fees being imposed on members of the Class and offend Connecticut's public policy.

161.    The acts, omissions, misrepresentations, policies, practices and non-disclosures as alleged herein were intended to, and did, result in the sale of the products at issue to plaintiff and the Class and violated and continued to violate the CUTPA.

162.    Defendants, in connection with the advertising, tender and/or delivery of the products at issue, employed unconscionable tactics and inserted unconscionable provisions into the sales of the products at issue herein by unilaterally attempting to impose an automatic, unauthorized fee for enrollment in a fictitious and/or useless and unwanted membership which is offensive to Connecticut's public policy.

163.    Defendants advertised the products at issue with the intent not to sell them as advertised or represented.

164.    Defendants have made false or misleading representations concerning the nature of the transaction or obligation incurred concerning the products at issue.

165.    Defendants have made false or misleading representations concerning the offering price of, or the person's cost for the products at issue.

166.    Defendants have used plaintiff's and class members' credit and/or debit cards with the intent to injure and/or defraud plaintiff and class members by the unauthorized use of plaintiff's and class members' credit and/or debit cards in regards to the products at issue.

167.    Defendants' unfair or deceptive acts or trade practices, of knowingly and willfully enrolling, charging and collecting an invalid and illegal membership fee from plaintiff and all putative class members, are immoral, unethical, oppressive, despicable, reprehensible, unscrupulous and have and continue to cause substantial financial injury.

168.    MWI profited at the expense of plaintiff and the Class by systematically enrolling them in a MWI program and charging their credit/debit cards without their authorization.

169.   By reason of the foregoing, plaintiff, members of the Class and the general public have been (and will continue to be) irreparably harmed.

170.   Defendants' conduct also violates CUTPA in that Defendants either were or reasonably should have been aware that imposition of such representations and fees is unfair, unlawful and/or fraudulent under the circumstances.

171.   Defendants' use of bait products to promote the sale of the products at issue through false and deceptive representations as alleged herein constitutes unfair and deceptive acts within the meaning of Conn. Gen. Stat. §42-110a.

172.   Injuries suffered by plaintiff and the Class were not outweighed by any countervailing benefits to plaintiff and class members.

173.   At all times material to this Complaint, Defendants were acting for financial gain within the meaning of CUTPA.

174.   Defendants knowingly concealed, suppressed and omitted in their scripts, advertisements and membership kits, material facts about the deceptive products at issue with intent that plaintiff and the Class would rely upon the concealments, suppressions or omissions, in violation of CUTPA.

175.   Through the unauthorized enrollment into the products at issue, plaintiff and the Class were subjected to unauthorized charges to their credit/debit cards thereby suffering "ascertainable and quantifiable losses" as a result of Defendants' unlawful, unfair and fraudulent business practices in violation of Conn. Gen. Stat. §42-110a *et seq*.

176.   Pursuant to Conn. Gen. Stat. §42-110(g), plaintiff and class members are entitled to their actual damages, punitive damages and injunctive relief

177.   Pursuant to Conn. Gen. Stat. §42-110(g)(d), Defendants are liable for costs and attorneys' fees.

178.     The conduct of Defendants, as set forth herein, was unlawful, unfair, immoral, unscrupulous, deceptive and/or fraudulent and constitutes unfair and deceptive acts in violation of Conn. Gen. Stat. §42-110a.

179.     A copy of this Complaint has been mailed to the Connecticut Attorney General Richard Blumenthal, pursuant to Conn. Gen. Stat. §42-110(g)(c).

180.     Plaintiff reserves the right to allege other violations of law which constitute unlawful business acts or practices.  Defendants continue to posses funds that belong to the class members, to this date.

## COUNT VII

### For Conversion
### (On Behalf of Plaintiff and the Members of the Class)

181.     Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-180 above.

182.     Defendants have converted to their own use, property belonging to plaintiff and members of the Class through unlawful acts and conduct.  The specific sum of money that was converted by Defendants should be readily identifiable from information and records in Defendants' possession or control.

183.     Defendants knowingly or intentionally charged and collected money for unordered merchandise from credit and/or debit card accounts of consumers, including plaintiff and members of the Class.  Defendants obtained money from consumers through fraud and/or deception. Defendants thus converted to their own use property, specifically monies, belonging to plaintiff and the Class.

184.     The specific sum of money of plaintiff and members of the Class that was converted by Defendants are readily identifiable from information and records in Defendants' possession or control.

185.    As a direct and proximate result of Defendants' unlawful acts and conduct, plaintiff and the Class were deprived of the use of their money that was unlawfully converted by Defendants, and are thereby entitled to restoration of their monies, interest on these monies from the date said monies were converted by Defendants to the date of judgment, compensatory damages (including overdraft fees paid by consumers due to Defendants' conversion of their money) and punitive damages.

## COUNT VIII

### For Unjust Enrichment
### (On Behalf of Plaintiff and the Members of the Class)

186.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-185 above.

187.    Defendants have received, and continue to receive, a benefit at the expense of plaintiff and members of the Class.

188.    Defendants have fraudulently and/or deceptively charged and collected membership fees and/or renewals from consumers, including plaintiff and members of the Class, for unordered merchandise.  Accordingly, Defendants have received benefits which they have unjustly retained at the expense of plaintiff and members of the Class.

189.    As a direct and proximate result of Defendants' unlawful acts and conduct, plaintiff and members of the Class were deprived of the use of their money that was unlawfully charged and collected by Defendants, and are therefore entitled to restoration of their monies.

## COUNT IX

### For Fraud
### (On Behalf of Plaintiff and the Members of the Class)

190.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-189 above.

191.    The acts, conduct and practices of Defendants, as alleged above, were fraudulent and deceptive.  The use of deceptive scripts assuring consumers that they were being mailed a free 30-day trial membership is and was likely to mislead, and did in fact mislead, plaintiff and members of the Class.  Through the use of the deceptive scripts, Defendants made false representations that they knew to be false in order to enroll plaintiff and class members in an MWI membership program and pay associated costs charged to their credit and/or debit cards, resulting in damage to the plaintiff and class members.

192.    Plaintiff and members of the Class ordered non-MWI products.  Approximately one month later, class members were enrolled in an MWI membership program and were charged an approximate amount of between $60 and $150 to their credit or debit cards.  Eleven months after the initial charge, Defendants charged the class members approximately the same amount (usually 15%-25% more) without seeking any approval to do so.  These charges, if undetected, will keep occurring in subsequent years.

193.    Through the use of deceptive scripts that were read to the class members, Defendants concealed material facts from plaintiff and the members of the Class.  Defendants tell and have told members of the Class that they are being mailed a risk-free 30-day trial membership.  No permission to use the consumers' credit and/or debit cards is sought or obtained.  The scripts deceive members of the Class.  After mailing the unsolicited membership kit to the class members, Defendants charge the members of the Class for an unsolicited and unwanted membership.

194.    Defendants falsely and fraudulently utilize deceptive scripts that conceal from the class members that they will be automatically charged unless the class members affirmatively call Defendants to cancel the membership.  Defendants' scripts contain misrepresentations and are intended to, and do, deceive the class members.

195.    Defendants intentionally designed the scripts and the purported membership material in order to mislead the class members into believing that they would receive a risk-free trial membership that they could try out, and if they liked the membership, the class members could contact Defendants to activate a full membership.  The true facts are just the opposite – Defendants charge the class members unless they call to cancel.

196.    Defendants have intentionally designed the generic membership materials so as to appear to be "junk mail" in the hopes that the materials will be discarded and thus never read.  If the packet mailed by MWI for the risk-free trial membership is thrown out by the recipient, then the consumer will not have the number to access the benefits.  The kits are mailed out bulk rate indicating the lack of value of the material.  In this way, Defendants further conceal the fact that the class members will be charged an annual, self-renewing membership fee.

197.    To further their scheme to conceal the true facts, Defendants never send any invoice or bill to plaintiff and the class members informing them that their credit and/or debit cards were going to be, or were in fact, charged.

198.    Defendants' renewal of the purported memberships is fraudulently concealed by Defendants in the same manner.  No bill or invoice is sent to the class members informing them that they were going to be, or had in fact been, charged.

199.    Plaintiff and members of the Class reasonably relied on Defendants and believed that they were making a one-time purchase of non-MWI products.

200.    Defendants' false and misleading statements and suppression of the material facts set forth above and throughout this Complaint defrauded plaintiff and the Class, and are in direct violation of federal and state statutes, as well as principles of common law, for which plaintiff and members of the Class are entitled to recover damages.

## COUNT X

### Negligent Misrepresentation
### (On Behalf of Plaintiff and the Members of the Class)

201.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-200 above.

202.    In making representations to plaintiff and members of the Class described herein, Defendants failed to fulfill their duty to disclose the material facts set forth above. Among the direct and proximate causes of said failures to disclose were the negligence and carelessness of Defendants.

203.    Defendants owed plaintiff and members of the Class the duty to act with reasonable care in retaining, training and supervising their agents and sales agents. Defendants also failed to take reasonable steps to ensure that their representatives conducted themselves in accordance with the law and to ensure that the representatives disclosed all material facts and did not misrepresent or omit such facts in conducting such sales.

204.    Defendants, as set forth herein, breached their duties to retain, train, supervise and discipline their sales force and to ensure full disclosure by them.

205.    Plaintiff and the members of the Class were unaware of the falsity of Defendants' affirmative misrepresentations and their failure to disclose that plaintiff and members of the Class would be charged undisclosed and unauthorized fees for a fictitious membership on their credit card accounts. Plaintiff and the members of the Class, as a direct and proximate cause of Defendants' breaches of their various duties, reasonably relied upon such representations to their detriment. By reason thereof, plaintiff and members of the Class have suffered damage, in an amount according to proof at time of trial.

## COUNT XI

### Money Had & Received
### (On Behalf of Plaintiff and the Members of the Class)

206.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-205 above.

207.    As a result of Defendants' conduct as alleged herein, Defendants improperly received monies from plaintiff and the Class they were not legally entitled to receive.

208.    Plaintiff and class members have a claim for improperly paid fees for the products at issue.

209.    Equity and good conscience require that Defendants ought to pay over such additional monies, described above to plaintiff and the Class.

210.    As a direct and proximate result of Defendants' unfair, unlawful, deceptive and fraudulent business practices, plaintiff and class members have suffered injury and are entitled to reimbursement, restitution and disgorgement in the amount necessary to restore them to the position they would have been in if Defendants had not improperly enrolled, billed, collected and retained the aforementioned unauthorized membership fees.

## COUNT XII

### Reckless & Wanton Misconduct
### (On Behalf of Plaintiff and the Members of the Class)

211.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-210 above.

212.    Defendants' actions and omissions alleged herein, to the extent not intended by the Defendants to mislead and deceive the plaintiff and class members into paying charges not authorized for unwanted services, were untaken with reckless disregard for the rights of plaintiff and class members and/or with reckless disregard of the likely consequences of their actions.

213.    Defendants' actions and omissions alleged herein amounted to reckless and/or wanton misconduct which have caused plaintiff and the Class to suffer damages to an extent to be determined at trial.

## COUNT XIII

### Civil Theft
### (On Behalf of Plaintiff and the Members of the Class)

214.    Plaintiff hereby realleges and incorporates by reference the allegations contained in ¶¶1-213 above.

215.    Through their misrepresentations, omissions, unfair, unlawful, deceptive and fraudulent business practices, Defendants deprive the plaintiff and class members of their monies collected by MWI.

216.    Plaintiff and class members have been damaged as a result of Defendants' civil theft.

217.    In accordance with Conn. Gen. Stat. §52-564, plaintiff and class members are entitled to recover treble damages.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff on behalf of himself and the members of the Class, prays for judgment and relief against Defendants as follows:

A.    For an order certifying the Class and appointing plaintiff and their counsel to represent the Class;

B.    For compensatory damages sustained by plaintiff and the members of the Class as a result of Defendants' unlawful acts and conduct, including interest and any overdraft fees caused by Defendants' unlawful taking of consumers' money;

C.    For treble damages pursuant to 18 U.S.C. §1964(c) and Conn. Gen. Stat. §52-564;

D.    For restitution of all monies acquired by Defendants from plaintiff and the Class as a result of Defendants' wrongful practices described above;

E.      For a declaration that any unordered merchandise received by plaintiff and the members of the Class from Defendants may be treated as a gift by the recipient under applicable federal law and Connecticut law;

F.      For statutory and common law punitive damages to be awarded to plaintiff and the members of the Class;

G.      For pre-judgment and post-judgment interest to be awarded to plaintiff and the members of the Class;

H.      An order preliminarily and/or permanently enjoining Defendants from pursuing the policies, acts and practices complained of herein;

I.      An order of this Court ordering Defendants to immediately cease all acts of unfair competition and enjoin Defendants from continuing to conduct business via the unlawful, unfair or fraudulent business acts or practices as particularized herein;

J.      An order requiring Defendants to identify all class members and pay restitution to plaintiff and all members of the Class so as to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, fraudulent or unfair business act or practice, in violation of applicable laws, statutes or regulations or constituting unfair competition or untrue or misleading advertising;

K.      An order of the Court requiring Defendants to disgorge to the State of Connecticut all monies wrongfully collected that could not be returned to class members as alleged herein and all monies and profits derived by Defendants as a result of the wrongful, deceptive, unfair and/or unlawful acts, conduct and practices alleged above, and requiring disgorgement and/or imposing a trust upon Defendants' ill-gotten monies and freezing Defendants' assets;

L.      For the costs and expenses incurred in this action, including reasonable attorneys' fees and experts' fees; and

M.     For an order awarding such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

THE PLAINTIFF,
MICHAEL L. WASLIN, On Behalf of Himself
and All Others Similarly Situated

By: _____/s/ Daniel M. Young_____
Eric M. Higgins (CT 11609)
Daniel M. Young (CT 17188)
WOFSEY, ROSEN, KWESKIN &
   KURIANSKY, LLP
600 Summer Street
Stamford, CT  06901-1490
Telephone:  203/327-2300
203/967-9273 (fax)

OF COUNSEL:

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
FRANK J. JANECEK, JR.
JAMES A. CAPUTO
CHRISTOPHER COLLINS
CHRISTIE SURIEL
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/ 231-7423 (fax)

LANDSKRONER • GRIECO • MADDEN, Ltd.
JACK LANDSKRONER
1360 West 9th Street, Suite 200
Cleveland, OH  44113
Telephone:  216/522-9000
216/522-9007 (fax)

LAW OFFICES OF ARTIE BARAN, APC
ARTIE BARAN
4545 Murphy Canyon Road, Suite 300
San Diego, CA  92123
Telephone:  858/560-5600
858/836-0318 (fax)

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Amended Complaint was mailed by first class mail, postage prepaid, this 5th day of February 2009 to the defendants' authorized agents as follows:

Vertrue Inc.
c/o William A. Durkin III, Esq.
One Atlantic Street
Stamford, CT  06901


Adaptive Marketing LLC
c/o George Thomas, Esq.
20 Glover Avenue
Norwalk, CT  06850


_____/s/ Daniel M. Young_____
Daniel M. Young